In re James J. CUTILLO, Appellant,

v.

Jerry HUBNER and Steven
Hubner, Appellees.

In re James J. Cutillo and Holly
J. Cutillo, Debtors.

Jerry Hubner and Steven
Hubner Plaintiffs,

v.

James J. Cutillo, Defendant.

No. IP 98–0087–C–T/G.
Bankruptcy No. IP–96–10102–L–V–7.
Adversary No. 97–174.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 31, 2000.

Henry Efroymson, Ice Miller Donadio & Ryan, Indianapolis, IN.

Alfred E. McClure, McClure Law Office, Westfield, IN.

Mark R. Galliher, Hopper Wenzel & Galliher, Indianapolis, IN.

**Entry Reviewing Decision
of Bankruptcy Court**

TINDER, District Judge.

The Appellant, James J. Cutillo, appeals the decision of the bankruptcy court, the Honorable Basil H. Lorch, III, which determined that certain of his debt to Jerry Hubner and Steven Hubner is excepted from discharge by operation of 11 U.S.C. § 523(a)(2)(B).

## I. Background

Jerry Hubner and Steven Hubner filed a Complaint to Determine Dischargeability of Debt. The case was tried before the bankruptcy court on September 19, 1997, and on December 19, 1997, the court entered judgment, finding that $81,307.10 was excepted from discharge by operation of 11 U.S.C. § 523(a)(2)(B). James Cutillo took a timely appeal from that decision.

Cutillo was a shareholder, director and president of Equity Financial Services, Inc. ("EFS"), which was engaged in the business of marketing and brokering mortgage loans. In the fall of 1994, EFS needed additional capitalization, so Cutillo and James and Rosie Hunter, also shareholders of EFS, offered the Hubners an opportunity to invest in the corporation, obtain 10% of EFS's outstanding stock, and become officers and directors of the business.

The Hubners sought financial information on EFS. Cutillo transmitted written financial information of EFS by facsimile on November 14, 1994. The balance sheet showed that EFS had substantial net worth and identified, as an asset, fees receivable by EFS in the amount of $91,734.15. The balance sheet was consistent with the projected income statement which

768

showed that beginning 1½ months after the date of the report, EFS would be generating gross income in the amount of $87,850 per month, increasing to nearly $300,000 per month by the end of 1995. The information included a "pipeline report," identifying mortgage loan transactions in the process of being closed by EFS during the weeks after November 15, 1994. This report indicated that EFS was in the process of closing loans which would produce fees of $91,734.15. More than $60,000 of the "fees collected" identified in the pipeline report bore the "Loan Status" designation "A," which indicated that such loans had already been approved by a mortgage lender and only awaited closing.

Steve Hubner spoke at length with Cutillo in order to evaluate the financial information provided. Cutillo reported that EFS was closing between 35 and 50 mortgages per month, generating an average gross fee from each closing of about $1,500. This "pipeline information" regarding mortgage loans currently scheduled to be closed by EFS was particularly significant to Hubner because if EFS had current commitments to close loans from which fees in excess of $60,000 would be generated, EFS was likely to generate substantial net profits and pay substantial dividends to the Hubners, as projected by the financial statements transmitted by Cutillo.

The financial information also included a "key account summary" which reflected that EFS could expect to generate more than 1,400 mortgage loan transactions from several large referral sources, thus generating net fee income in 1995 in excess of $600,000. The key account summary indicated, and Hubner confirmed with Cutillo, that the key accounts represented existing relationships from which EFS was already receiving substantial referrals.

The written financial information Cutillo transmitted to the Hubners was false. EFS had neither $90,000 nor $60,000 of mortgage fees in the pipeline. Rather, from November 1994 through May 1995,

the monthly gross fee receipts averaged less than $15,000 and was less than $10,000 in several months. Of the files identified in the pipeline report, 18 apparently were non-existent and no more than 12 actually closed. EFS never received any substantial volume of business from the key accounts and had no source of mortgage loan funding for the manufactured and modular housing sellers identified as existing key accounts in Cutillo's summary.

Cutillo was intimately involved in EFS's operations and had ready access to its books and accounting records. Based on his involvement in the business, he had to be aware that EFS was not closing between 35 and 50 loans per month at an average fee of $1,500.

To further induce the Hubners to invest in EFS, Cutillo misrepresented that their investment would be used to defray the capital costs of opening a South Bend satellite office, which was the agreed upon basis for the Hubners' investment. Cutillo needed their investment to defray accumulated payroll and other debts owed by EFS, and the Hubners' investment was used to pay such debts.

The Hubners referred the information to their accountant for his review and recommendation. Thereafter, the Hubners decided to invest in EFS. They contributed $75,000 to the capital of EFS in exchange for 20% of the outstanding shares. They were to become officers and directors of EFS and would have operating responsibility for a South Bend branch of EFS. The transaction was closed on December 2, 1994. Cutillo remained president of EFS as well as a 40% shareholder and director. James Hunter retained his 40% of EFS's stock as well. Had the Hubners known that EFS was not generating the substantial fee income represented by Cutillo's transmittal, they would not have invested in EFS stock.

The Hubner's investment was injected into EFS during December 1994. The South Bend office opened that month and two employees began working under the

Hubner's direction. On December 20, 1994, the Hubners issued a check in the amount of $6,307.10 to Checks & Balances, a payroll firm, to cover the payroll of the two South Bend employees.

EFS continued to lose money, largely because it was having trouble finding investors to fund the large number of manufactured housing loans in the pipeline. As a result, in February 1995, the Hubners injected additional funds into EFS by way of a guaranty of $100,000 line of credit. EFS's financial status did not improve. On June 7, 1995, the Hubners, along with Hunter, removed Cutillo as an officer and director of EFS, installing Steve Hubner in his place. Thus ended Cutillo's contact and involvement with EFS.

## II. Analysis

■ The bankruptcy court's findings of fact are upheld unless clearly erroneous and the legal conclusions are reviewed de novo. *See Matter of A-1 Paving & Contracting, Inc.*, 116 F.3d 242, 243 (7th Cir. 1997). The Appellant challenges the bankruptcy court's findings and conclusions regarding the non-dischargeability of certain of the debt owed the Hubners. 11 U.S.C. § 523(a)(2)(B) provides in pertinent part:

> A discharge .... does not discharge an individual debtor from any debt for money ... to the extent obtained by ... use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive ....

The issues presented by this appeal are whether the bankruptcy court erred in finding that (1) Cutillo "obtained money"; (2) Cutillo used a statement in writing that was materially false respecting the Debtor's or an insider's financial condition; (3) the Hubners reasonably relied on the statements in writing; (4) the check for $6,307.10 was paid as a result of the Hub-

ner's continuing reliance on the statements in writing; and (5) Cutillo intended to deceive the Hubners as to the current financial condition of EFS.

Cutillo argues he did not obtain any money because all of the Hubners' money was used for EFS's purposes. He claims that he derived no benefit from the money. He also claims that the Hubners' investment resulted in control of EFS by the Hubners and Hunter to the complete exclusion of Cutillo.

■ The bankruptcy court's finding that Cutillo obtained money from the Hubners is not clearly erroneous. Several courts of appeals have held that where an individual uses fraud to induce another to pay money to that individual's corporation or partnership, the individual has "obtained" such money within the meaning of Section 523(a)(2)(B). *See, e.g., In re Bilzerian*, 100 F.3d 886, 890–91 (11th Cir.1996); *BancBoston Mortgage Corp. v. Ledford*, 970 F.2d 1556 (6th Cir.1992); *Luce v. First Equip. Leasing Corp.*, 960 F.2d 1277 (5th Cir. 1992); *Ashley v. Church*, 903 F.2d 599 (9th Cir.1990). The *Bilzerian* court rejected an argument much like that made by Cutillo here:

> [G]ranting a debtor a discharge based solely on the fact that he or she did not directly receive a benefit places a limitation on § 523 that is not apparent from the text of the provision itself. Moreover, such a limitation would provide a dangerous incentive for the sophisticated debtor, who could circumvent the provision by creating a shell corporation to receive the fruits of his or her fraud. As we have previously stated, we will not allow the malefic debtor [to] hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct.

100 F.3d at 891. *In re Bilzerian* and these other decisions are persuasive. Even though Cutillo may not have directly obtained the Hubners' money, as president and a shareholder of EFS, he received the benefit of their money invested in EFS.

In that regard, it is noted that Cutillo received compensation as president of EFS. The court concludes that the bankruptcy court did not clearly err in finding that Cutillo obtained the Hubners' money.

■ The bankruptcy court's finding that the written financial information as to EFS that Cutillo transmitted to the Hubners was materially false and misleading is not clearly erroneous. The written financial information represented that EFS had an asset of fees receivable in the amount of $91,734.15 and that beginning 1½ months after the date of the projected income statement, EFS would generate gross income in the amount of $87,850 per month, increasing to nearly $300,000 per month by the end of 1995. In addition, the pipeline report indicated that EFS was in the process of closing loans from which $60,000 in fees would be generated and for which the loans had already been approved by a mortgage lender and only awaited closing. Further, the information in the key account summary reflected that EFS could expect to generate more than 1,400 mortgage loan transactions from several large referral sources, thus generating net fee income in 1995 in excess of $600,000. This summary indicated that the key accounts represented present existing relationships from which EFS was already receiving substantial referrals. These representations made by the written financial information provided by Cutillo were representations of EFS's present existing financial condition, not mere projections, contrary to Cutillo's contentions.

Moreover, these representations were false. EFS did not have $90,000 or even $60,000 of mortgage fees in the pipeline. Of the files identified in the pipeline report, 18 apparently were non-existent and no more than 12 actually closed. From November 1994 through May 1995, the monthly gross fee receipts averaged less than $15,000 and was less than $10,000 in several months. EFS never received any substantial volume of business from the key accounts and had no source of mortgage loan funding for the manufactured and modular housing sellers identified as existing key accounts in Cutillo's summary.

Cutillo argues that the bankruptcy court erred in finding that the financial statements, namely the balance sheet, portrayed EFS as solvent and profitable because it reflected an accumulated net income loss for November 30, 1994 and reflected that EFS's current cash assets were less than its current liabilities. Cutillo chooses to ignore the fact that the balance sheet represents that EFS's total assets exceeded its total liabilities by more than $300,000 and that EFS had sufficient income in the pipeline to meet expenses. The bankruptcy court correctly found that the written financial information Cutillo transmitted to the Hubners portrayed EFS as a solvent and profitable business.

■ The bankruptcy court's finding that the Hubners reasonably relied on the written financial statements that Cutillo provided them is not clearly erroneous. The evidence, specifically Steve Hubner's testimony, establishes that the Hubners did in fact rely on the written financial information provided by Cutillo. Cutillo's assertion that the Hubners relied on their accountant rather than on Cutillo or the written financial statements finds no support in the testimony cited by Cutillo nor anywhere else in the record. The cited testimony establishes that the Hubners' accountant reviewed the information provided by Cutillo; it does not establish that the Hubners' relied on their accountant rather than Cutillo and the statements provided by him. (*See* Tr. at 10, 18.) Cutillo also maintains that the Hubners could not have reasonably relied on the written financial information he provided because that information showed EFS to be unprofitable and insolvent. As discussed, however, the information showed EFS's total assets to be in excess of its total liabilities, reflected a large number of scheduled closings in the pipeline, and showed existing relationships with several key accounts. Moreover, Steve Hubner

discussed EFS's financial situation at length with Cutillo, and Cutillo never indicated that EFS was insolvent or unprofitable. Instead, he stated that EFS was closing between 35 and 50 mortgages per month, generating an average gross fee from each closing of about $1,500.

 The evidence supports the bankruptcy court's finding that the Hubners paid $6,307.10 for payroll owed by EFS for employees hired for the South Bend office. Cutillo argues that the evidence supports an inference that the two employees were employees of the Hubners, but any such inference based on the record would not be reasonable. Steven Hubner testified without contradiction that the two employees were hired for the South Bend office of EFS. The evidence establishes that within a few short weeks after making their initial $75,000 investment in EFS, the Hubners paid a check in the amount of $6,307.10 for payroll owed EFS for the two employees hired for the South Bend office. Thus, the bankruptcy court did not clearly err in finding that the Hubner's check for $6,307.10 was paid as a result of their continued reliance on the written financial statements.

 The bankruptcy court's finding that Cutillo intended to deceive the Hubners as to the current financial condition of EFS is not clearly erroneous. Cutillo contends that an intent to deceive is inconsistent with a projected balance sheet that shows EFS as unprofitable and insolvent. As discussed, however, the balance sheet provided the Hubners did not show EFS as unprofitable and insolvent. He also claims that he himself believed the projections he provided to the Hubners. Whether he believed in the future projections is irrelevant. The fact remains that Cutillo made representations to the Hubners of EFS's present financial condition and these representations were false. Given Cutillo's involvement in EFS's operations as president and his ready access to its books and records, as the bankruptcy court found, Cutillo had to know that such information was false. He had to know that EFS was

not closing loans at the monthly rate or average fee he represented orally to Steve Hubner. Cutillo also had to have been aware that the key accounts did not represent existing relationships and that EFS was not receiving substantial referrals from those accounts—several were nonexistent. In addition, he had to know that the Hubners' investment would be used, not to defray costs of opening a South Bend office, but for accumulated payroll and other debts owed by EFS. Lastly, Cutillo claims that he diminished his interest in EFS. The evidence, however, established that Cutillo owned 40% of EFS stock both before and after the Hubners invested in EFS.

### III. Conclusion

The bankruptcy court's decision that $81,307.10 of Cutillo's debt to the Hubners is excepted from discharge by operation of 11 U.S.C. § 523(a)(2)(B) withstands the court's review on appeal and, therefore, is **AFFIRMED**.